## [No. 2022.]

### *Ex Parte* J. Tom Wilson.

1. Habeas Corpus — Practice.— Under a proper construction of article 187 of the Code of Criminal Procedure, an accused who, prior to the return of indictment, has been awarded a hearing under the writ of *habeas corpus*, is, upon the return of indictment, entitled to a second writ of *habeas corpus*, and, notwithstanding the indictment, is entitled to bail if the facts in proof warrant bail. If, however, the original proceedings by *habeas corpus* were had after the return of indictment, a second writ is not allowable, except in the special cases arising under articles 155 and 189 of the said Code. The said article 155 authorizes the award of such second writ when the removal or release of the accused on bail is rendered necessary by disease; and the said article 189 allows the second writ, where important testimony, impossible to have been produced upon the first hearing, is shown to have been newly discovered. The original writ in this instance having issued prior to the return of indictment, the subsequent writ, after indictment, was properly awarded.
2. Same — Fact Case.— See the statement of the case for evidence adduced in a proceeding by *habeas corpus* for bail under an indictment for murder *held* to authorize the award of bail. Under the evidence, however, the sum of $7,000 is *held* to be excessive, and the bail is reduced to the sum of $3,500.

*Habeas Corpus* on appeal from Kaufman County. Tried in chambers before the Hon. Anson Rainey, Judge of the Fortieth Judicial District.

The relator was held under an indictment which charged him with murder. The indictment is not brought up as a part of the transcript, but it appears from the record that the fatal injury was inflicted upon the deceased, Dave Finley, in Kaufman county, Texas, on the 3d day of October, 1885, and that the said Finley died on the 5th day of the same month. The proceedings from which this appeal is prosecuted were had on the 20th day of January, 1886, when the trial judge awarded the relator bail in the sum of $7,000. The purpose of this appeal was to secure the reduction of bail. The judgment rendered below is reversed, and the bail bond of the relator is fixed by this court in the sum of $3,500. The statement of facts comprises the narratives of a large number of witnesses. In but few instances does the transcript indicate on which side they were individually introduced.

D. F. Mallory was the first witness called to the stand. He testified that he resided in Elmo, Kaufman county, Texas, but was in the town of Terrell on the day of the homicide. Witness did not know Mr. Finley, the deceased, and had never seen him before

that day, when he saw him for the first time about "Sam and Jim's" saloon. A short while before the difficulty the defendant (?) — [evidently the *deceased* is meant] — started towards the west part of the town, saying that he was going to get a pistol and settle the difficulty. He went some ten or fifteen steps in a trot, and increased his speed to a run. Mr. Wilson, the appellant, was then some twenty-five or thirty steps distant from Finley, and, in common with others around, could have heard what Finley said. Mr. Finley returned in about thirty minutes. Mr. Wilson and Doctor Nelson had some words, but the witness did not hear them. Witness went into "Sam and Jim's" saloon some time before this, and at that time saw Mr. Wilson standing on the gallery in front of the saloon. Wilson did not see Finley when the latter came into the saloon, but some one told him that Finley was back. Witness next saw Wilson standing in the back yard of the saloon. He was leaning against the fence when Finley started up to him. Wilson told Finley to go away; that he did not want a difficulty. Finley replied that he could whip him, Wilson, on any part of the ground or in any way. Wilson replied that he wanted no fuss, that fusses had reduced him to what he was. Wilson then went into the house, followed by several parties. Finley remained in the yard for a while, and then came back into the saloon and cursed and abused Wilson. Wilson again told him that he wanted no difficulty, went out of that saloon, and sat down on a beer keg in front of the saloon of one Moses. Finley then went to the gallery in front of "Sam and Jim's" saloon, shook his finger at Wilson, who was still sitting on the beer keg at the other saloon, and told Wilson that his mother was a whore, and his sisters were bitches. Finley then got on his horse and rode off west, as already stated by witness. When he returned about thirty minutes later, he walked into the saloon at the front door. Wilson was then standing outside of the door. Someone told Wilson that Finley had come back. Ables then had hold of Finley, pushing him back, and about that time Wilson walked into the saloon. Ables kept pressing Finley back; Finley kept cursing and abusing Wilson, and finally caught up a billiard ball from the billiard table. Wilson then said: "If balls are your game, I am with you." Finley thereupon threw a billiard ball at Wilson and missed him. Wilson then caught up a ball but did not throw it. Finley then threw another billiard ball at Wilson, struck him with it, and knocked him down. Wilson then fired. Finley was the first to take up a billiard ball. Before he did so, he went behind the bar, and was pushed back by Tine Dubendoff. He,

Finley, was endeavoring to get at Wilson all of the time, but was prevented by Mr. Ables and others. Witness saw nothing in Finley's hand, except the billiard balls. He saw blood on Mr. Ables's hand, after Mr. Ables had pushed Finley back, which was before Finley threw the first ball.

Cross-examined, the witness said that the conversation between Finley and Wilson in the back yard of the saloon, and Finley's denunciation of Wilson's mother as a whore, and his sisters as bitches, occurred before Finley went off to get a weapon. Wilson remained sitting on the keg in front of Moses's saloon about twenty minutes. Two parties went to him in the meantime. Those two parties were the Hardin boys. Witness did not see Doctor Parsons go to him. Witness did not see Wilson when he left the keg. He did not see Finley when he first got back. Witness next saw Wilson, after he left the keg, on the gallery in front of "Sam and Jim's" saloon. This was about thirty minutes after Wilson went to the keg and sat down. Several men were on the gallery at the time that Wilson was there. It was during that time that Finley passed into the saloon, and that was the first time witness saw him after his return. Wilson was standing on the end of the gallery next to the Harris House. Finley came from the direction of the depot, and witness was unable to say whether or not he could see Wilson as he passed into the saloon. When Wilson went into the saloon after being told that Finley had come back, he went towards Finley. The crowd from the outside followed Wilson into the saloon. No one had or took hold of Wilson before or at the time of the killing. Somebody — Mr. Ables witness thought — took hold of Finley as Wilson walked in. Witness did not, at any time, hear Wilson ask Finley if he was fixed, armed, or anything of like import, and witness was confident that, had Wilson asked such a question, he would have heard it. He did not hear Ables tell Wilson not to come on, as Finley was not armed. Finley was trying all of the time to get away from Ables, and Ables was trying to push him towards the back end of the house. Ables pushed Finley to a point under the stairway, and at that time Wilson was walking towards the side door next to the Harris House. Finley was on the south side of the pool table, next to the stair steps, when he threw the first ball. The two billiard tables in the room stood east and west. Wilson was near the north billiard table,— perhaps five or six feet distant,— when he fired. Ables had hold of Finley when he was shot. Witness was standing within two feet of Wilson when he fired. Atlas Oldham and A. T. Wilson were standing about six feet from Wilson

when the shot was fired. Witness did not see Wilson have a weapon until he fired. He did not see Wilson pick up a piece of scantling as he came into the door. Wilson did not throw a billiard ball during the fight. Witness saw nothing fall out of Wilson's pocket when he was knocked down.

Atlas Oldham was next called to the stand. He testified that he was present at the difficulty and saw Finley killed. As the witness walked into the house, the relator was shaking his finger at the deceased, and the witness heard him say to the deceased: "You nasty, dirty, stinking scoundrel, I will take no more of your abuse." About that time the deceased caught up a billiard ball in each hand. The relator said: "If throwing balls is your game, here is at you," and caught up a ball in each hand. Deceased threw a ball at, and missed the relator, and then threw another ball and knocked the relator down with it. As the relator raised up from the floor he drew his pistol and fired. Witness heard none of the abuse and quarreling which was said to have preceded the shooting. Deceased had no weapons in his hand that the witness saw. Witness saw Ables by the deceased, but did not think that Ables interposed. Witness did not see the relator throw a billiard ball, but saw a ball strike the wall above the deceased. The ball struck above deceased after deceased threw his first ball, but before the shooting.

B. S. Wood and Mr. Gibbs testified that, in their opinion, a billiard ball in the hands of an ordinary man could be made to kill another man by striking him in certain places.

Andy Ables testified, for the State, that he saw the deceased and the relator in "Sam and Jim's" saloon. It seemed to the witness that the deceased took up, on Doctor Nelson's part, a dispute that had occurred between the relator and Nelson. They quarreled some and tried to fight. Witness took the relator in charge and the deceased went out of the house. He presently came back and went behind the bar and tried to borrow a pistol. Witness took the deceased back into the rear of the house and talked to him. He then had a small pocket-knife in his hand. He went out at the front door, saying that he was going home. He came back, and witness, who was then at the back part of the house, saw the relator coming in behind him. Deceased walked very fast towards the billiard tables. The relator said to him: "Dave, are you fixed?" Witness took hold of the deceased at the lower end of the bar and told the relator that the deceased was unarmed. Witness then told A. T. Wilson to stop the quarrel. The relator then caught up a scantling, but Sam St. Mary and some one else took it

away from him. Just before this the relator called the deceased a son-of-a-b—h. After the scantling was taken from the relator, he walked to a point between the two pool tables and asked the deceased if he was fixed, repeating the question several times. Witness at that time had hold of the deceased. When he called upon A. T. Wilson to put a stop to the difficulty, witness released the deceased. The relator then picked up a pool ball and threw it at the deceased, and both parties grabbed balls. Deceased then knocked the relator down, and the relator's pistol fell out of his pocket as he fell. As the relator rose up he shot the deceased. While the deceased was gone off the relator told the witness that he had bought a pistol; that certain parties had run over him long enough because he had no money. The relator had the pistol in the morning. The relator was the first to throw a billiard ball. When the relator first asked the deceased if he was fixed, he had his hand back under his coat. Witness heard the relator, some time before the difficulty, tell deceased to go and arm himself. He heard the relator ask Sam and Jim to lend him money with which to buy a pistol for Finley.

Cross-examined, the witness said that the deceased was a farmer, and, he supposed, was used to an active life. Deceased used a great deal of violent language to the relator. The deceased came back to the saloon within thirty minutes after he left, saying that he was going home. The difficulty between the relator and Doctor Nelson occurred before the difficulty between the deceased and the relator. Witness saw Doctor Nelson arm himself with an old cheese-knife. Messrs. F. and Bud Hardin took the knife away from Doctor Nelson. The old cheese-knife was capable of inflicting death. Doctor Nelson and relator apparently reached an amicable settlement of their dispute. No dispute existed between the relator and the deceased before the dispute between the relator and Nelson. Witness released the deceased when the billiard-ball throwing commenced. Just before the shooting, the deceased tried to get a pistol from behind "Sam and Jim's" counter. Deceased had a small pocket-knife in his hand when the first quarrel commenced, and witness received a small cut on his hand from it in attempting to hold the deceased. Doctor Nelson and the relator had settled their difficulty when the witness first saw the defendant with a pistol that evening. The relator was under the influence of whisky. He told witness that he did not want to have any difficulty with the deceased. Witness was trying to get the deceased's knife when he got his hand cut. Deceased would not surrender the knife.

Re-examined, the witness said that he did not see the relator with

the pistol until after he and Doctor Nelson had made friends. While deceased was gone the relator told the witness that he got $10 from his wife, and bought the pistol. Witness did not see the deceased with any arms of any kind at the time he was killed. Witness heard the deceased say that he could whip Tom Wilson on any part of the ground. Relator and deceased both cursed, but deceased used the most violent and offensive language.

William Renfro was the next witness. He testified that he was a clerk in the hardware store of W. C. Griffith & Bro. The relator got a pistol at the store about sundown on the evening of the homicide. He loaded it in the store, and said that some one had insulted him in a manner to which he was not going to submit. A pistol just like the one the relator got came back to the store. It was a double-action Smith & Wesson forty-four caliber.

Cross-examined, the witness said that the Griffiths had gone home when the relator came into the store and got the pistol. Mr. C. L. Jones was present and heard the statement made by the relator when he got the pistol. The relator got the pistol late in the evening, but before lamp-lighting. The evening was a cloudy one.

Frank Hardin testified, for the State, that he knew of the difficulty between the relator and the deceased, but was not present at the time of the killing. Witness left "Sam and Jim's" saloon about sundown, going to his home about five miles north from town. Witness heard the first of the difficulty, in which some very bad language was used. Witness heard the relator ask the deceased if he was "fixed," to which the deceased replied that he was ready for the relator at any time. Thereupon the witness pushed the relator out of the door. The deceased then approached the relator and began to talk to him about the difficulty which had occurred between relator and Nelson. Nelson and relator settled their difficulty about thirty minutes before the witness left. When witness pushed the relator out of the door, the latter sat down on a keg. Witness went to him at the keg and tried to persuade him to go home. If the relator then had a pistol, witness failed to find it. When the witness left, the deceased was in "Sam and Jim's" saloon.

Cross-examined, the witness said that he started home between sundown and dark, leaving the relator sitting on the beer keg. Some ten or fifteen minutes had then elapsed since the adjustment of the quarrel between the relator and Nelson. The witness heard the deceased tell the relator that his mother was a whore and that he was a bastard. Witness saw Nelson make demonstrations at the relator

with a large knife. The difficulty between Nelson and the relator lasted for some time. Witness did not hear the relator tell deceased that he did not want a difficulty with him. Relator did say, however, in the hearing of the witness, that he wanted no difficulty with the deceased, but that he would not go home, as, in that event, people would say that he was afraid of deceased. The relator was drinking some. Witness did not know of the relator having any property. He told witness on the day of the trouble that he had none.

Joe Hardin testified that he stepped into "Sam and Jim's" saloon during the progress of the difficulty or quarrel between the relator and Nelson. The relator passed out of the saloon at the back way. The deceased followed and spoke to him. Relator waived him back with his hand, and told him to go away and let him alone. Deceased began to curse the relator, when some one interfered and brought deceased back to the front of the saloon. Relator passed out at the back door and presently returned with Nelson. The two, having settled their quarrel, stepped up to the bar together. After taking his drink, relator passed the deceased, going towards the front door, and said to him: "Dave, go home and get sober; then come back to town and I will give you a good whipping." Deceased began cursing the relator, and said, "You can't whip me as I am." Some one either pushed, or the relator went out of the door, and sat down on a beer keg. Witness shortly started home. As he passed the relator, witness heard some one ask him why he was sitting there. He replied: "I am waiting for a son-of-a-b——h." Witness did not know whether or not the relator then had a pistol.

Cross-examined, the witness said that the beer keg on which the relator took a seat was in front of the Moses saloon, about eighty feet due west of the "Sam and Jim" saloon. As relator passed out of the saloon after drinking with Nelson, the deceased told him that he, relator, could not whip him then. As the relator passed out of the saloon, the deceased remarked to him that his mother was a d—d bitch. It was about sundown when witness passed the relator on the beer keg. Witness at that time saw Doctor Parsons going towards the relator.

T. J. Barron testified that the deceased was his brother-in-law. Deceased came to witness late in the evening of the homicide, and asked for a pistol. He got no pistol from the witness.

A. T. Wilson testified, for the relator, that he entered "Sam and Jim's" saloon about dark on the evening of the homicide. As the witness stepped in, the relator started towards the back door.

Ables, who then had hold of the deceased, turned him loose. The relator and the deceased then advanced upon each other, throwing balls. The deceased was knocked down, dropped his pistol as he fell, and, as he arose, shot the deceased. Ables had again caught hold of deceased and was trying to detain him. Ables got his hand cut at that time. Witness understood Ables to say that he got his hand cut then, in his effort to restrain the deceased. The relator had neither property nor affluent relatives. His wife had tried to make a bond for him, but had failed.

Doctor Parsons testified that, before he went to supper on the evening of the homicide, he saw the relator sitting on the beer keg in front of Moses's saloon. The relator told witness that he and Nelson had made friends, but that he was waiting to see another man. After supper witness saw the relator in " Sam and Jim's " saloon. He took a seat near the relator, when the relator said: "There is that man now," got up and started towards the deceased, who was then in the far end of the saloon near the pool table. Witness tried but failed to stop him, and stepped out of his way. The relator then had a pistol, and was, the witness thought, very much intoxicated.

Major Cunningham testified that he saw the relator and Doctor Nelson make friends at " Sam and Jim's " saloon, late in the evening, but before the homicide. Witness then went to supper. About sundown on that evening witness saw two men following the relator in the back yard of the saloon, and heard the relator tell them to go away, as he did not want any trouble with them. Witness, who did not know either of the men, told them to go away and let the relator alone. While in the saloon, witness heard the deceased say: " Tom Wilson, the d—d son-of-a b—h; I will kill him!" Witness asked him what was the matter, and he repeated the words. Witness did not know whether or not the relator heard him.

Sam St. Mary testified that he was one of the proprietors of the "Sam and Jim " saloon. He saw the fatal difficulty which occurred on Saturday evening, October 3, 1885. The relator was in the saloon talking to the sheriff at the time that the deceased came in. As deceased came in, the relator remarked to the sheriff: " They have all been imposing upon me," got up and walked towards the deceased, who was beyond Ables from him. He asked the deceased: " Are you fixed?" and kept following deceased. Deceased retreated backwards, but made no reply that the witness heard. In backing, deceased kept his right hand behind him. Ables, who had hold of deceased, said: " No, Tom, he is not fixed." Deceased then called the relator a "motherly son-of-a-b—h," and the relator stooped to

pick up a scantling, but witness pushed him away and would not let him get it. Deceased then said to the relator: "I can whip you at any mark." The relator then caught up a ball from the pool table and threw it at the deceased. He then threw a second ball, when deceased threw a ball and struck the relator with it. Relator rolled over the end of the pool table, fell to his knees, rose with a pistol in his hand and fired. Deceased instantly sank to the floor and then pulled himself up by the table. Ables asked him if he was hurt, and he replied: "Yes, I am shot." Ables and others removed him to the door for fresh air, and afterwards took him to the Terrell House. Witness heard the first pool ball strike the wall. He thought that the second ball must have struck some person, otherwise it would have struck the wall, and witness would have heard it. The sheriff caught the relator after the pistol fired.

S. S. Dubendoff testified that he got into the saloon just before the fatal shot was fired. Going in he passed immediately behind the bar. The relator just at that moment left his seat and started back through the saloon. Witness did not then know that the deceased was in the house. When he started, the relator began cursing, and said, "are you fixed?" Some one, whether deceased or another party witness did not know, replied: "No!" Several persons then ran between the relator and the deceased. Still another crowd gathered between the witness and the crowd at the parties. Just at that time the relator stooped to get a scantling, but was prevented by some one. He then repeated his question: "Are you fixed?" several times. When he failed to get the scantling, the relator said: "O s—t!" and turned as though to leave, and witness thought the row was over. A few moments later witness heard a racket which he thought was occasioned by throwing pool balls, though he saw none thrown. He saw the relator and the deceased grabbing at the table, and making motions like they were throwing something. The crowd about this time scattered and the witness saw the relator rising from a stooping position with a pistol in his hand. He pointed the pistol across the pool table and fired, and the deceased began to sink to the floor, catching the table as he went down. Several parties then took the deceased to the Terrell House, where he died at fifteen minutes past 2 o'clock on the 5th day of October, 1885.

J. W. Reed testified that he saw the latter part of the difficulty which culminated in the death of Finley. Witness was in "Sam and Jim's" saloon when Doctor Parsons came to the relator, who was then sitting in a chair in the front part of the saloon. Parsons

tried to get the relator to go home. Relator refused to go. Parsons and the sheriff got hold of the relator and a kind of a scuffle ensued. About that time the deceased came in at the back door, and somebody said: "Yonder he is, Tom; he has come." ·Relator said: "Turn me loose!" and was released. He then pulled his pistol and started towards the deceased, calling: "Dave, are you fixed?" Ables replied: "No, Tom, he is not armed." Ables had hold of the deceased at that time. Relator then started back towards the front door and said: "If you aint fixed, it is all right. I don't want to hurt you if you are not armed." Deceased then began cursing, but witness could not say that he was cursing the relator. The relator turned and went back towards some whisky barrels to the right of the billiard tables. Both the parties then proceeded to curse each other as sons-of-b—hes, and the relator stooped to get a piece of scantling, but was prevented by some one. Aux Wilson then caught the relator. The relator pulled loose from Aux Wilson, went to the left corner of the billiard table, and began to gather up pool balls. Deceased caught up a ball about the same time. The two men began throwing balls about the same time. The relator fell to the floor, got up, pulled a pistol from the waistband of his pants, and fired. Witness saw the relator with the pistol before the shooting. He wanted to fire it off in the house after deceased told him he was not fixed. The relator drew his pistol, and said: "I am fixed!" Deceased said that he was not armed, but could whip the relator at any time. During the evening witness saw the relator hunting the deceased around town with a pistol, and knew that he ran the deceased into the saloon.

The record of the proceeding had upon the hearing of a former writ of *habeas corpus*, which was sued out prior to the return of indictment, and under which the relator's bail was fixed in the sum of $7,000, was next read in evidence.

*J. S. Woods*, for the relator.

*J. H. Burts*, Assistant Attorney-General, for the State.

Hurt, Judge. Appellant is charged with murder. Before indictment found he applied for bail, which was granted, his bond being fixed at $7,000. After indictment he again applied for the writ of *habeas corpus*, which was granted and heard by the district judge, and his bail again fixed at $7,000. From this judgment he appeals because, he says, from the evidence and his pecuniary circumstances this amount is excessive.

The assistant attorney-general insists that, as appellant had obtained the writ and a hearing thereon in the first instance, that he was not entitled to the second writ; and, as he failed to appeal from the first judgment fixing his bail at $7,000, and as there is no pretense of newly discovered evidence, appellant is now without remedy; that the judge who heard the case in chambers should have sustained the motion of the district attorney to dismiss the second writ, etc.

This position we think unsound. Article 187, Code of Criminal Procedure, provides that when a person once dischaged, or admitted to bail, is afterwards indicted for the same offense for which he has been once arrested, he may be committed on the indictment, but shall be again entitled to the writ of *habeas corpus*, and may, notwithstanding the indictment, be admitted to bail, if the facts of the case render it proper; but in cases where, after indictment found, the case of the defendant has been investigated on *habeas corpus*, and an order made either remanding him to custody or admitting him to bail, he shall neither be subject to be again placed in custody, unless when surrendered by his bail or when the trial of his case commences before a petit jury; nor shall he be again entitled to the writ of *habeas corpus* except in the special cases mentioned in articles 155 and 189.

By article 155 a party is entitled to the writ in cases of necessity, to wit, when the party is in legal custody, and is afflicted with disease rendering his removal necessary.

Article 189 gives him the second writ in case of newly discovered important testimony, which was not in his power to produce at the first hearing.

We therefore conclude that if the first writ issue and is heard before indictment, the party is entitled to a second writ after indictment found, but that he is not entitled but to one writ either before or after indictment found, unless the case is made to come within the provisions of articles 155 or 189.

We have carefully read the statement of facts in this case, and must say that they impress us with the belief that a $7,000 bond is excessive. Appellant is very poor, almost entirely without property, and with but few friends. Viewing the case through these facts, we believe a bond in the sum of $3,500 sufficient.

The judgment of the court below is reversed, and the appellant is ordered to be discharged upon his giving bail in the manner provided by law in the sum of $3,500.

*Ordered accordingly.*